# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP2205 |

| | |
|---|---|
| COMPLETE TITLE: | In the interest of C. G., a person under the age of 18:<br><br>State of Wisconsin,<br>    Petitioner-Respondent,<br>  v.<br>C. G.,<br>    Respondent-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 396 Wis. 2d 105, 955 N.W.2d 443
PDC No:2021 WI App 11 - Published

| | |
|---|---|
| OPINION FILED:<br>SUBMITTED ON BRIEFS: | July 7, 2022 |
| ORAL ARGUMENT: | February 17, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Shawano |
| JUDGE: | William F. Kussel, J. |

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to all parts except ¶¶6 and 36-46, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶6 and 36-46, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. HAGEDORN, J., filed a concurring opinion. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Cary E. Bloodworth*, assistant state public defender. There was an oral argument by *Cary E. Bloodworth*.

For the respondent-appellant-petitioner, there was a brief filed by *Scott E. Rosenow*, assistant attorney general, with whom

on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Abigail Potts*, assistant attorney general.

An amicus curiae brief was filed by *Abigail L. Churchill, Hayley I. Archer*, and *Trans Law Help Wisconsin,* Madison and *Hawks Quindel, S.C.*, Madison, for Trans Law Help Wisconsin and Hawks Quindel, S.C.

An amicus curiae brief was filed by *Matthew S. Pinix, Marsha L. Levick*, and *Pinix Law, LLC,* Milwaukee, and *Juvenile Law Center*, Philadelphia, for Juvenile Law Center, national Center for Lesbian Rights, Lambda Legal Defense and Education Fund, and Eric S. Janus.

An amicus curiae brief was filed by *Matthew E. Kelley John A. Knight, Laurence J. Dupuis*, and *Ballard Spahr LLP,* Washington, D.C., *American Civil Liberties Union of Wisconsin Foundation, Inc.,* Milwaukee, and *American Civil Liberties Union Foundation LGBT & HIV Project,* Chicago, for the American Civil Liberties Union Foundation and American Civil Liberties Union of Wisconsin Foundation.

No.  2018AP2205-CR
(L.C. No.  2016JV38)

STATE OF WISCONSIN           :       IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification.  The final version will appear in the bound volume of the official reports.**

**In the interest of C. G., a person under the age of 18:**

**State of Wisconsin,**

       **Petitioner-Respondent,**

   **v.**

**C. G.,**

       **Respondent-Appellant-Petitioner.**

**FILED**

**JUL 7, 2022**

Sheila T. Reiff
Clerk of Supreme Court

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to all parts except ¶¶6 and 36-46, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶6 and 36-46, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.  HAGEDORN, J., filed a concurring opinion.  ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined.

REVIEW of a decision of the Court of Appeals.  *Affirmed*.

¶1  REBECCA GRASSL BRADLEY, J.  When Ella was 15 years old, she and another teenager, Mandy, sexually assaulted their

supposed friend, 14-year-old Alan.[1] The circuit court adjudicated Ella delinquent.[2] Ella moved to stay juvenile sex offender registration, arguing she and her offense satisfied the four criteria in Wis. Stat. § 301.45(1m)(a)1m. (2017-18). The court denied her motion, finding the offense was "clearly a forceful act"; therefore, it concluded Ella's offense could not satisfy one of the criteria. As a result, the law required Ella to register as a sex offender. Less than a year later, Ella filed a postdispositional motion to stay registration. She seeks review of a court of appeals decision[3] affirming the circuit court's denial of this motion.

¶2 Ella's legal arguments are grounded in her gender identity. She entered the juvenile justice system as a male. Sometime thereafter, Ella realized she was a transgender girl, i.e., a biological male who self-identifies as a girl. Ella has a traditionally masculine legal name she believes is incompatible with her gender identity. Ella complains she is bound to "out herself" as a male anytime she is required to

---

[1] The facts underlying this case involve three juveniles, for whom we use pseudonyms. Cf. Wis. Stat. § (Rule) 809.81(8) (2019-20).

[2] The Honorable William F. Kussel, Jr., Shawano County Circuit Court, presided.

[3] State v. C.G., 2021 WI App 11, 396 Wis. 2d 105, 955 N.W.2d 443.

2

produce her legal name.[4]  If Ella were not a sex offender, she could petition the circuit court for a legal name change under Wis. Stat. § 786.36 (2019-20);[5] however, another statute, Wis. Stat. § 301.47(2)(a), prohibits her from filing such a petition because she is a sex offender, although the State argues it does not prohibit her from using an alias provided she notifies the Department of Corrections (DOC) of her intent to do so in advance.

¶3  Ella raises two legal issues for our consideration. She argues requiring her to register as a sex offender: (1) constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution as applied to her; and (2) violates her right to free speech under the First Amendment to the United States Constitution.  Both arguments rest on Ella's inability to change her legal name to conform to her gender identity.

¶4  We reject both arguments.  Consistent with well-established precedent, we hold Ella's placement on the sex offender registry is not a "punishment" under the Eighth Amendment.  Even if it were, sex offender registration is neither cruel nor unusual.  We further hold Ella's right to free speech does not encompass the power to compel the State to

---

[4] See out, Merriam-Webster's Collegiate Dictionary (11th ed. 2014) (defining "out" as "to identify publicly as being such secretly" and "esp : to identify as being a closet homosexual[.]").

[5] All subsequent references to the Wisconsin Statutes are to the 2019-20 version.

3

facilitate a change of her legal name. We therefore affirm the decision of the court of appeals.

## I. BACKGROUND

### A. An Overview of Ella, the Perpetrator

¶5 Ella, who is now 22, questioned her gender identity throughout her adolescence. After the State filed a delinquency petition against Ella, she began to express "thoughts of transitioning." By the time the court held a hearing on Ella's first motion to stay sex offender registration, she had started transitioning. At this point, she thought of herself as a transgender girl and began self-identifying and attempting to present her appearance in a manner consistent with her newfound self-awareness.[6] The circuit court found she is now fairly open about her status as a member of the "LGBTQ"[7] community.

¶6 Because Ella entered the juvenile justice system as a male, many relevant records——including records prepared at the direction of Ella's appellate counsel——refer to her using male pronouns.[8] When quoting those records, we use those pronouns.

---

[6] Ella has not filed a legal name change petition under Wis. Stat. § 786.36. Before the court of appeals, the State argued Ella's First Amendment claim was not ripe because the "claim is based on the possibility that she might someday unsuccessfully try to change her name." C.G., 396 Wis. 2d 105, ¶29 n.7. The court rejected this argument because Ella is prohibited by Wis. Stat. § 301.47(2)(a) from changing her legal name. Id. The State has not raised ripeness before us, so we address it no further.

[7] LGBTQ stands for Lesbian, Gay, Bisexual, Transgender, and Queer or Questioning.

[8] See, e.g., R. 95:3 n.1 ("Because [Ella] is still legally considered to be male, and it is as a male that he entered the

4

Elsewhere in our opinion, however, we use female pronouns out of respect for Ella's individual dignity.  All parties and amici curiae used her preferred pronouns in their briefing, and the court of appeals used them in its published opinion.[9]

¶7  Ella's size is critical to understanding the forceful nature of the sexual assault.  The circuit court found Ella was "pretty massive."  Although we do not have anything in the record giving Ella's exact dimensions at the time of the sexual assault, a youth justice case worker testified at a hearing a little over a year later that Ella was 6-foot-5-inches tall and weighed 345 pounds, taking this information from a face sheet

---

criminal justice system, he is referred to throughout the evaluation report [by his legal name], and as a male.").

[9] We recognize the use of preferred pronouns is a controversial issue.  No law compels our use of Ella's preferred pronouns; we use them voluntarily.  Our decision to do so bears no legal significance in this case, nor should it be construed to support their compulsory use.

Although cautioning courts to "remain scrupulously neutral" with respect to the use of pronouns, Justice Brian Hagedorn does not recognize in his concurrence that referring to Ella as C.G. will be seen as a partisan choice by many readers.  Concurrence, ¶101.  The "ontological and moral question[]" over pronouns is neither legal in nature nor within the scope of the issues presented.  See id., ¶99.  We join the parties and the court of appeals in referring to Ella using her preferred pronouns.  In addition to showing respect for Ella's individual dignity, using the same convention as the parties ensures we "remain scrupulously neutral"——in contrast, Justice Hagedorn uses a convention even the State, which is adversarial to Ella, has chosen not to use.  Id., ¶101.  The only alternatives to choosing between masculine and feminine pronouns in this opinion would either offend the rules of grammar (the singular "they") or produce a stilted writing (exclusive use of proper nouns).

5

prepared by the DOC. A report submitted by Ella's appellate counsel said she was 6-foot-4-inches tall and weighed 300 pounds.

### B. An Overview of Alan, the Victim

¶8 In contrast to Ella, Alan is a heterosexual male. He had minimal prior sexual knowledge before Ella sexually assaulted him. He did not know what the word "ejaculated" meant when a law enforcement officer questioned him about the assault. The officer had to rephrase his question, asking "if anything came out of [Alan's] penis" as a result of Ella's contact with it.

¶9 Alan was diagnosed with autism between one-and-a-half and two years of age. When he was four months old, a medical condition necessitated the surgical removal of the lens of his left eye, leaving him blind in that eye. For nearly all of Alan's life, he has needed physical and speech therapy. His mother testified at the dispositional hearing Alan was 5-foot-10-inches tall and weighed 110 pounds. Based on this testimony, the circuit court inferred Alan was "pretty frail[.]"

¶10 Alan's mother further testified his autism significantly affects his learning and social abilities. Specifically, his mother testified he has done poorly in school, has had an Individualized Education Program, and has needed special classes. At the time of the assault, Alan was a ninth-grader but his mother explained he worked at a sixth-grade level and was "nowhere near where he should be with the rest of his peers."

¶11   Alan's mother also explained he has never had much of a "social life[.]"   According to her, people often become annoyed by Alan because he does not understand social cues, such as when to stop a conversation.   As a result, he has "had a hard time making friends."   Part of the tragedy of this case is that Alan's first "supposed friends," or more accurately, "the first group of people" with whom he socialized, unsupervised by adults, took advantage of him.   She explained the assault has had a profound impact on his life, causing Alan grave embarrassment.

### C.   The Sexual Assault

¶12   Alan appears to have met Ella through Mandy, a female classmate.   All three juveniles were in the ninth grade at the time of the sexual assault; however, Ella was fifteen and Alan was fourteen.   According to the officer's narrative attached to the delinquency petition, in early 2016, Mandy's sister picked up Mandy, Ella, and Alan and drove them to Mandy's parents' house.   The four of them went into Mandy's bedroom where they talked and texted.   Eventually, Mandy's sister left to go to work.   Whether Mandy's parents were home is unclear, but the petition suggests Alan believed they were.

¶13   As night time approached, Ella began sending sexually-explicit Facebook messages to Alan.   She first asked Alan "if he had ever received 'head' before."   Ella then sent at least two messages about giving Alan "head."   Alan repeatedly told Ella he did not want her to give him "head."   Alan showed the messages to Mandy.   In response, Mandy told Alan he should let Ella "do

7

it because it feels great." Alan told her he "did not want to get 'head' from a guy."

¶14 Despite Alan's explicit rebukes, Ella "pushed" him onto the bed. Ella sat on his legs while Mandy restrained his arms. Ella then pulled his pants and underwear down. Alan tried yelling for help, hoping Mandy's parents were home and would hear his cries; however, Mandy placed one of her hands over Alan's mouth. Ella then put her mouth around Alan's penis. Ella's appellate counsel characterizes the assault as "brief[] . . . oral contact with a male friend's penis against his wishes," but this assault was a heinous act that forever changed Alan's life.

¶15 Afterward, Ella and Mandy told Alan not to tell anyone what they had done to him. Alan did not say anything because he was embarrassed. Ella, apparently, was not: she told at least two classmates. She also taunted Alan via Facebook Messenger:

Ella:    Remember that time I gave you head??

Alan:    It was fucking unconfortable.

Ella:    Uncomfortable*

Alan:    Com

Ella:    Cum ?? Well anyways if it wasn't for me being nice, I was gonna do it to you in the Garage Just saying

Alan:    Yea ik that's y I felt weird

Ella:    you know you liked it.

Alan:    No

¶16 The high school rumor mill began to turn, and word got back to Alan that his classmates knew he had been sexually assaulted by Ella. Alan had various conversations via Facebook Messenger indicating he had been assaulted. A few months after the sexual assault, Alan's parents discovered the Facebook messages between Alan and his classmates indicating he had been assaulted and notified law enforcement.

D. Procedural History

¶17 The State filed a delinquency petition against Ella, alleging one count of sexual assault of a child under the age of 16 and one count of disorderly conduct (both counts as a party to the crime). The circuit court accepted Ella's no-contest plea to the sexual-assault count and dismissed but read in the disorderly-conduct count.

¶18 At a dispositional hearing, the circuit court committed Ella to the DOC for six to ten months, some of which was spent at Lincoln Hills, a secure juvenile correctional facility. The court described the sexual assault as "a violent attack" because Alan was "held down by two individuals," and it was "clearly done against [his] will[.]" The court also emphasized Ella's physical stature—she's a large person, and she preyed on a frail victim. It also noted Alan's disabilities. It found placement in the home would be "contrary to the welfare of the juvenile and the community" because Ella "engaged in a forceful delinquent act to a child. He jeopardized and victimized this child. [Ella] needs to have intensive treatment to help him develop a better thought process

9

to where he can improve his decision making skills and reduce his impulsive behaviors."

¶19 Ella filed a motion to stay sex offender registration. The circuit court held a hearing, denied the motion, and ordered Ella to register as a sex offender for 15 years. In March 2018, Ella filed a postdisposition motion to stay sex offender registration. The circuit court denied the postdisposition motion, concluding that sex offender registration is appropriate and constitutional.

¶20 The circuit court concluded sex offender registration is not punishment under the Eighth Amendment. The circuit court's discussion of Ella's First Amendment claim is more complicated because Ella couched her First Amendment claim in terms of a violation of substantive due process. She argued, "[s]ubstantive due process protects against government action that is arbitrary and wrong regardless of the fairness of the procedure used to implement them. To prevail on a substantive due process claim, the claimant must show the infringement of one or more liberty interests."[10] She then listed four "liberty interests" in the following order, all under the heading "Wisconsin's juvenile SOR provisions violate substantive due process":

1. Reputation.

2. Right to travel/freedom of movement.

3. Freedom of speech/expression.

---

[10] Quotation marks omitted.

10

4. Informational privacy.

Under the subheading "[f]reedom of speech/expression," Ella focused her discussion on substantive due process. For example, she argued:

> Few decisions are as deeply personal and important as a person's right to live in a manner consistent with their gender identity. "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." Obergefell v. Hodges, 135 S. Ct. 2584, 2593 (2015). Constitutionally protected liberty interests are those that implicate "individual dignity and autonomy"——i.e., decisions or actions that "shape an individual's destiny." Id. at 2597, 2599. A person's core internal sense of their own gender, and what that means for their everyday life, is profoundly central to their personal identity in ways the Constitution protects.[11]

This discussion, which included multiple references to Obergefell, a landmark substantive due process case, demonstrates Ella made a different claim before the circuit court than on appeal.

¶21 The circuit court understood itself to be adjudicating a substantive due process claim, not a free speech claim. It provided a thorough, written opinion explaining why the law did not "shock the conscience . . . or interfere[] with rights implicit to the concept of ordered liberty."[12] It concluded, "[t]he name change restriction is reasonably related to the purpose of the statute; registration by its very nature needs to

---

[11] Ellipsis in the original.

[12] Ellipsis in the original.

11

keep accurate records of its registrants." Additionally, it noted, "[t]he court understands that it could be emotionally difficult for an LGBTQ person to have to reveal their LGBTQ status; however, . . . it does not appear that [Ella] has taken any action to hide her LGBTQ status."

¶22 Ella appealed and the court of appeals affirmed. On appeal, Ella did not mention substantive due process at all, instead focusing on her cruel and unusual punishment claim and converting her substantive due process challenge into a free speech claim. The court of appeals rejected Ella's Eighth Amendment argument. First, it concluded sex offender registration is not punishment based on well-established precedent. State v. C.G., 2021 WI App 11, ¶¶41-47, 396 Wis. 2d 105, 955 N.W.2d 443. Second, it concluded Ella cannot bring an as-applied challenge to circumvent this precedent. Id., ¶¶44-47. The court of appeals also rejected her First Amendment claim, holding Wis. Stat. § 301.47(2)(a) does not implicate the freedom of speech. Id., ¶¶26-32. Even if free speech were at issue, the court of appeals determined the law would be at most a content-neutral restriction on speech, and it would survive intermediate scrutiny because it "is sufficiently tailored to achieve the State's important interest in efficiently tracking registered sex offenders." Id., ¶¶33-40. Ella filed a petition for review, which we granted.

## II. STANDARD OF REVIEW

¶23 The constitutionality of a statutory scheme is a question of law, which we review independently while benefitting

12

from the analyses of the lower courts. T.L.E.-C. v. S.E., 2021 WI 56, ¶13, 397 Wis. 2d 462, 960 N.W.2d 391 (citations omitted); see also State v. Ninham, 2011 WI 33, ¶44, 333 Wis. 2d 335, 797 N.W.2d 451 (citation omitted).

### III. ELLA'S CRUEL & UNUSUAL PUNISHMENT CLAIM

¶24 The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Ella's Eighth Amendment claim fails for two reasons. First, sex offender registration is not a "punishment" within the meaning of that word as it is used in the Eighth Amendment. Second, even if it were, sex offender registration is neither cruel nor unusual.

### A. Sex Offender Registration Is Not a Punishment

¶25 "A deprivation cannot violate the Eighth Amendment's prohibition against 'cruel and unusual punishment' unless it first qualifies as 'punishment.'" Millard v. Camper, 971 F.3d 1174, 1181 (10th Cir. 2020) (citing Carney v. Okla. Dep't of Public Safety, 875 F.3d 1347, 1352 (10th Cir. 2017)). To determine whether sex offender registration is a punishment, courts look first to the intent of the legislature; if the intent is not to punish, only the "clearest proof" of the law's punitive effects can establish it constitutes punishment. Id. (quoting Smith v. Doe, 538 U.S. 84, 92 (2003)). At the effects stage, courts consider various factors. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168 (1963). These factors include, but are not limited to: (1) "whether [the sanction] has historically been regarded as a punishment"; (2) "whether its

13

operation will promote the traditional aims of punishment——retribution and deterrence"; and (3) "whether an alternative purpose [i.e., a nonpunitive purpose] to which it may rationally be connected is assignable[.]" Id. at 168-69.

¶26 Following the lead of almost every other court to have addressed the issue, this court in State v. Bollig determined the legislative intent of the sex offender registration scheme is not punitive, nor are its effects sufficiently punitive to constitute punishment. 2000 WI 6, 232 Wis. 2d 561, 605 N.W.2d 199. The case arose in the context of a motion for plea withdrawal. Id., ¶1. The petitioner contended his no-contest plea to attempted sexual assault was defective because the circuit court did not inform him that, as a result of his plea, he would be required to register as a sex offender. Id. Whether the plea was defective turned on whether sex offender registration is a collateral consequence of the criminal conviction or a punishment. Id., ¶16 ("Courts are constitutionally required to notify defendants of the 'direct consequences' of their pleas. . . . In contrast, defendants do not have a due process right to be informed of the collateral consequences of their pleas. . . . In essence, we must determine whether the registration requirement constitutes punishment." (citations omitted)).

¶27 This court began its analysis by noting, "[o]f the states that have addressed whether registration of sex offenders is punishment, all but one have answered in the negative." Id., ¶18. The general consensus among the courts of this nation at

14

that time continues to prevail: the intent of sex offender registration requirements is to protect the public, not punish the offender, and sex offender registration is not, in effect, so punitive as to constitute punishment. Id., ¶20 (citations omitted); see Smith, 538 U.S. at 96, 105 (concluding Alaska's Sex Offender Registration Act is nonpunitive in intent and effect); see also Hope v. Comm'r of Ind. Dep't of Corr., 9 F.4th 513, 534 (7th Cir. 2021) (concluding Indiana's sex offender registry is nonpunitive); Belleau v. Wall, 811 F.3d 929, 937 (7th Cir. 2016) (concluding Wisconsin's requirement that sex offenders subject to civil commitment wear a GPS monitoring device 24/7 is not a punishment, reasoning "[t]he monitoring law is not punishment; it is prevention" (citations omitted)); Millard, 971 F.3d at 1181 ("This court has twice, and the [United States] Supreme Court has once, determined that sex-offender registration requirements were not 'punishments' because their respective legislatures lacked punitive intent and their application lacked punitive effect." (citations omitted)).

¶28 As this court explained in Bollig, "[c]ourts that have determined that sex offender registration is not punitive have held that the underlying intent is public protection and safety. . . . Likewise, Wisconsin's registration statute does not evince the intent to punish sex offenders[.]" Bollig, 232 Wis. 2d 561, ¶¶20-21 (citations omitted)). The intent of the law is "to protect the public and assist law enforcement." Id., ¶21. "Registration statutes assist law enforcement agencies in

15

investigating and apprehending offenders in order to protect the health, safety, and welfare of the local community and members of the state." Id., ¶20 (citing State v. Burr, 598 N.W.2d 147, 153 (N.D. 1999); State v. Ward, 869 P.2d 1062, 1073 (Wash. 1994)).

¶29 Legislative history, examined in Bollig, confirms this common sense construction of sex offender registration. Id., ¶22 (examining the drafting file of 1995 Wisconsin Act 440, which substantially revised the sex offender registration statute and renumbered it to Wis. Stat. § 301.45). From the drafting file, "[t]he Executive Summary of Recommendations indicates that the intent underlying the legislation related to community protection." Id. (citing Wis. DOC, Sex Offender Community Notification i (1994)). "In addition, a stated goal included the balancing of community protection with the offender's community re-integration needs." Id. (citing Sex Offender Community Notification, at 1). This summary also reflected a concern that sex offenders not be subject to "vigilante-ism." Id., ¶25 (citing Sex Offender Community Notification, at 2).

¶30 The statute primarily at issue in this case, Wis. Stat. § 301.47, which prohibits sex offenders from changing their legal name, was enacted post-Bollig, but its legislative history confirms it is likewise not intended as a punishment. Senator Alberta Darling provided written testimony in support of the bill, explaining its purpose was to "close[] a major loophole" that had been plaguing the effectiveness of the sex

16

offender registry. Written Testimony of Senator Alberta Darling in Favor of AB 59 and AB 60 ((Written Testimony), Senate Committee on Education, Ethics & Elections (Mar. 27, 2003). She noted, "[l]ast fall the Department of Corrections reported that it is uncertain of the location of nearly 2,900 of the 11,000 offenders on the registry." Id.; Press Release, Darling to Push for Sex Offender Notification Changes, Office of Senator Alberta Darling (Oct. 9, 2002) ("The spirit and the intent of the original sexual predator notification law is being usurped by those who don't care about the penalties that are currently in place[.]").[13] She said the legislature had not anticipated the extent to which sex offenders would try to outwit the registration requirements. See Written Testimony. In particular, she noted, "[t]he Waukesha Police Department . . . encountered an offender who changed his name to avoid the registry." Id. Therefore, she thought the bill was necessary "because . . . this legislation will help protect children from harm and keep our communities safe." Id. See generally Jim Collar, Strengthening the Offender Registry, Oshkosh Northwestern, Mar. 4, 2003, at 1B (explaining "some Wisconsin officials want[ed] to make the [sex offender registration] laws stronger" because "public safety [was] hanging in the balance").

---

[13] Senator Darling did not describe registration as a penalty; she did discuss statutory penalties for failing to meet registration requirements.

17

¶31 In Bollig, after concluding the legislative intent was regulatory in nature, not punitive, this court examined the effect of the law. The petitioner argued, "registration and the subsequent public dissemination of information under [Wis. Stat.] § 301.46 constitute punishment, akin to traditional shaming punishments used throughout history to degrade those who have overstepped the boundaries imposed by law." Bollig, 232 Wis. 2d 561, ¶23 (citations omitted). Specifically, the petitioner noted registration often results "in ostracism, humiliation, and retaliation[.]" Id. This court rejected that argument because "§ 301.46 . . . does not automatically grant the public carte blanche access to the information." Id., ¶24. "[T]he selective release of information underscores that public protection, and not punishment, represents the core concern." Id.

¶32 This court recognized "that sex offenders have suffered adverse consequences, including vandalism, loss of employment, and community harassment[.]" Id., ¶26. Nevertheless, these effects "do not obviate the remedial and protective intent" of registration. Id. (citations omitted). "Simply because registration can work a punitive effect, we are not convinced that such an effect overrides the primary and remedial goal underlying Wis. Stat. § 301.45 to protect the public." Id.

¶33 A few years before Bollig, this court decided State v. Hezzie R., 219 Wis. 2d 848, 580 N.W.2d 660 (1998), amended on denial of reconsideration, 220 Wis. 2d 360. In that case, a

18

juvenile argued the Juvenile Justice Code (JJC) violated his state and federal constitutional rights. Id. at 869. The answer to some of the issues he raised turned on whether a juvenile proceeding was "a criminal prosecution." Id. at 871, 877. To support his argument that "for all intents and purposes" the JJC was a "criminal code," he argued a juvenile "is potentially subject to . . . a possible need to register as a sex offender[.]" Id. This court rejected that argument, reasoning, "[t]he requirements of [Wis. Stat.] § 301.45 . . . are only imposed on a juvenile who is adjudicated delinquent where the particular facts of the case and concerns for public safety dictate it. This is not criminal punishment[.]" Id. at 881; see also State v. Jeremy P., 2005 WI App 13, ¶15, 278 Wis. 2d 366, 692 N.W.2d 311 ("In light of our supreme court's conclusions in both Bollig and Hezzie, we cannot conclude that Jeremy has proven that Wis. Stat. §§ 938.34(15m)(bm) and 301.45(1m) are unconstitutional under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and article I, sections 7 and 8 of the Wisconsin Constitution."). Hezzie R. is consistent with the rule in most jurisdictions. See, e.g., United States v. Shannon, 511 F. App'x 487, 492 (6th Cir. 2013) (concluding Ohio's sex offender registration "as applied to juvenile delinquents" is not a punishment).

¶34 Ella acknowledges "[s]ex offender registration has not traditionally been viewed as punishment"; however, she seeks to circumvent longstanding precedent by arguing, as applied to her,

19

sex offender registration constitutes cruel and unusual punishment. The law, however, does not recognize as-applied challenges under the Eighth Amendment as to whether a statute is punitive. Whether a statute is punitive is determined in the abstract, without reference to "the facts and circumstances of an individual defendant." State v. Schmidt, 2021 WI 65, ¶30, 397 Wis. 2d 758, 960 N.W.2d 888 (citing Hudson v. United States, 522 U.S. 93, 100 (1997)); see also Kennedy, 372 U.S. at 169 ("Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face." (emphasis added)).

¶35 An "as-applied" analysis of whether sex offender registration constitutes punishment "would prove unworkable." See Seling v. Young, 531 U.S. 250, 263 (2001). Sex offender registration "extends over time under conditions that are subject to change." Id. Its nature, whether penal or non-penal, "cannot be altered based merely on vagaries" in the application of the statute to a particular offender's circumstances. Id. Accordingly, we do not "evalut[e] the . . . nature of [a law] by reference to the effect [the law] has on a single individual." Id. at 262.

¶36 Even assuming, however, that Ella could launch an as-applied challenge, her claim still fails.[14] In other words, even

---

[14] Justice Brian Hagedorn deems the analysis of Ella's as-applied challenged "improper." Concurrence, ¶96. It isn't. The analysis proves the point the United States Supreme Court made in Seling v. Young, 531 U.S. 250, 263 (2001): an as-applied challenge in the context of the Eighth Amendment is indeed unworkable, both substantively as well as temporally.

if we accepted her framework, which we do not, she still cannot show she has been subjected to punishment. Many of her complaints are not unique to her:

- For the next fifteen years, she is required to regularly report her legal name, aliases, date of birth, gender, race, height, weight, hair color, offense, address, internet profiles, email addresses, names and addresses of employment, and names and address of schools attended. Wis. Stat. § 301.45(2).

- She must notify the DOC each time she moves within 10 days of moving. § 301.45(4)(a).

- Under some circumstances, police may disseminate her identity to the public. Wis. Stat. § 301.46(5)(a).

- Some municipalities have ordinances that restrict where she can live.

- She will have to comply with specific statutory requirements to enter the premises of an elementary, middle, or high school. Wis. Stat. § 301.475.

These consequences of sex offender registration are no more a punishment for her than they were for the sex offenders in Bollig, Hezzie R., and numerous other cases.

¶37 Reporting requirements impose a nominal burden on liberty that directly serves the public safety purpose of the law. Additionally, this court rejected the argument that limited public dissemination of a sex offender's vital information constitutes "shaming" in Bollig. 232 Wis. 2d 561, ¶¶23-24. Ella also hyperbolizes the extent to which her information can be disseminated. Sex offender registration for adults is generally "confidential," with certain exceptions. Wis. Stat. § 301.45(7)(a). Under some circumstances (often

21

because there is a need to protect the public), Wisconsin law allows certain government agencies to share registry information about adult offenders with non-law enforcement agencies and the public. Wis. Stat. § 301.46(4) & (5). However, these provisions do <u>not</u> allow the distribution of "[a]ny information concerning a child who is required to register," § 301.46(4)(ag)1. & (5)(c)1., or "any information concerning a juvenile proceeding in which the person was involved" if the person is now an adult,[15] § 301.46(4)(ag)2. & (5)(c)2.

¶38 The restrictions on Ella's ability to enter a school raise a temporal question. The statute she cites defines "school" as "an educational program for one or more grades between grades 1 and 12 and which is commonly known as an elementary school, middle school, junior high school, senior high school, or high school." Wis. Stat. § 948.61(1)(b). Ella is now 22 years old and past her high school years. Whether we evaluate the punitive aspects of sex offender registration at the time it was imposed or presently, the requirements are nonetheless rationally connected to the public safety purpose of the law. Additionally, Ella asks us to consider that she "completed sex offender treatment," i.e., she wants us to consider her as she exists now, not as she existed at the time she committed her offense. She cannot have it both ways.

---

[15] The State informs us in its brief that Ella's legal name does not appear in the online sex offender registry.

22

¶39 The only atypical effects Ella recites relate to her gender identity. Much of her argument focuses on how Wis. Stat. § 301.47(2), which prohibits her from petitioning the circuit court for a legal name change, is particularly consequential for her, as a transgender woman. Specifically, Ella argues she has "a fundamental right to express her authentic gender identity." Because her legal name is male sounding, she believes it is inconsistent with this identity. At this point, Ella is 22 years old; however, she nonetheless argues her former status as a transgender youth, in combination with her status as a sex offender, create a particular hardship. She says, "[f]ull expression of gender identity" would "alleviate . . . day-to-day harassment and systemic discrimination."

¶40 Ella also argues requiring her to register as a sex offender lacks a rational connection to a nonpunitive purpose. This argument is largely grounded in social science that maintains juveniles who commit sexual offenses are at a low risk of reoffending. Ella also notes, "not a single psychologist who assessed Ella thought that requiring her to register would promote public safety."

¶41 As explained more thoroughly below, the law does not prohibit Ella from using an alias, only from petitioning the circuit court for a legal name change; therefore, nothing prevents her from expressing her gender identity. For example, nothing prohibits her from dressing in women's clothing, wearing make-up, growing out her hair, or using a feminine alias.

23

Perhaps more importantly, Ella's suggestion that the State has no rational basis for keeping track of her is incredible.

¶42 The circuit court noted many of the reports on which Ella relies to establish her low risk lack thoroughness. Specifically, the court stated, "[w]hen I looked at some of these reports too I also felt that they were -- I was a little surprised I thought they'd be a little more detailed, they don't seem to be." So, the court found, "they are not as compelling as they could have been." Effectively, the circuit court discounted these reports, noting, "[w]hile [Ella] argues that there is no evidence that juvenile sex offenders pose a significant risk of reoffending; the fact is that they still pose a risk. That is because low risk does not mean no risk." See Belleau v. Wall, 811 F.3d 929, 933-34 (7th Cir. 2016) ("[E]ven if we credit the 8 and 16 percent figures the plaintiff can't be thought just a harmless old guy. Readers of this opinion who are parents of young children should ask themselves whether they should worry that there are people in their community who have 'only' a 16 percent or an 8 percent probability of molesting young children——bearing in mind the lifelong psychological scars that such molestation frequently inflicts." (citations omitted)). The court also hypothesized that, to some extent, studies regarding juvenile sex offender recidivism might demonstrate little more than that registration "can help prevent further offenses by making it more difficult for an offender to reoffend; that is, they may be prevented from residing close to potential victims, and they may not be able to

commit such crimes with the same anonymity as a non-registrant." The court also noted at the hearing on the first motion, "I believe from the evaluations, the latest evaluations from Lincoln Hills indicates that he's at high risk."

¶43 The circuit court further found Ella's conduct was "impulsive" and "an opportunistic type of action," i.e., she took advantage of a victim who was vulnerable, despite the victim's repeated pleas for Ella to stop.  Sex offender registration is designed to eliminate opportunities for people who cannot control their impulses.

¶44 The facts of the underlying offense are highly relevant.  While Ella and Alan were close in age, Alan has autism, was significantly behind in school, and is blind in one eye.  The sexual assault also involved an element of force; it was a very serious offense.  In the words of the circuit court, "[t]he serious and forceful nature of this attack should not and cannot be glossed over.  The child was physically held down, against his will, with the assistance of an accomplice while [Ella] sat on the child's legs and pulled his pants and underwear down."  Mandy placed her hand over Alan's mouth "to prevent him from crying out for help."  Ella was also significantly larger than Alan.  Ella knew what she had done was wrong; she told Alan not to tell anyone.  Had Ella been an adult, she would have been guilty of a Class C Felony carrying a maximum penalty of 40 years of imprisonment and a $100,000 fine. Wis. Stat. § 939.50(3)(c).

¶45 Events occurring after the sexual assault also demonstrate a need to protect the public.  After Ella sexually assaulted Alan, she taunted him via Facebook; she also told fellow students at school about the assault, perpetuating Alan's victimization and trauma.  The circuit court also found Ella had "act[ed] inappropriately" at Lincoln Hills "when she attempted to kiss another student without the student's permission."  The court was particularly concerned about this event:  "this behavior needs to be put in context with the fact that the juvenile was at Lincoln Hills for a delinquency resulting from [the] underlying act of 2nd degree sexual assault of a minor child."  Although Ella admitted this attempted kissing was wrong, her acknowledgment "is no guarantee that [she] will not sexually act out in an illegal manner in the future.  This act is not evidence of a reduced risk to reoffend, but rather evidence of an increased risk to reoffend."

¶46 In summary, sex offender registration does not constitute punishment under the law, which does not recognize Ella's as-applied challenge.  Requiring sex offenders like Ella to register their whereabouts with the State is rationally related to the public safety purpose underlying the law.  The record in this case amply illustrates the connection between tracking sex offenders like Ella and protecting the public.

B.  Sex Offender Registration Is Neither Cruel Nor Unusual

26

¶47 Ella's Eighth Amendment claim fails even if sex offender registration could be construed as punishment because registration is neither cruel nor unusual. The United States Supreme Court considers punishment cruel and unusual only if it falls into one of two categories: (1) "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted"; or (2) "punishment inconsistent with 'evolving standards of decency that mark the progress of a maturing society.'" Ninham, 333 Wis. 2d 335, ¶46 (quoting Ford v. Wainwright, 477 U.S. 399, 405-06 (1986)).[16]

¶48 The founding fathers included the Eighth Amendment in the Bill of Rights because of their familiarity with "atrocities" committed under English law. Wilkerson v. Utah, 99 U.S. 130, 135 (1878). Sir William Blackstone, who had a profound impact on the framers of the Constitution, identified "[c]ases . . . where the prisoner was drawn or dragged to the place of execution, in treason; or where he was embowelled

---

[16] But see John F. Stinneford, Experimental Punishments, 95 Notre Dame L. Rev. 39, 54 & n.91 (2019) (explaining the "'evolving standards of decency' test" "take[s] a snapshot of current public opinion. This is the most democratic means of measuring the constitutionality of a punishment. If the sovereign people approve the punishment, it must be constitutional. But this approach is inconsistent with the premise underlying a written Bill of Rights, which is that the Constitution should constrain what is sometimes called the 'tyranny of the majority.' When caught in a moral panic——concerning drug dealers, juvenile superpredators, or sex offenders, for example——public opinion is likely to support extreme punishments in order to restore a sense of social control. The Constitution is meant to constrain the tendency to excess, not facilitate it.").

27

alive, beheaded, and quartered, in high treason." Id. He also mentioned "public dissection in murder, and burning alive in treason committed by a female." Id. These are classic examples of punishments prohibited by the Eighth Amendment under the first category, all of which involve the infliction of severe and unnecessary physical pain, often carried out as a spectacle for onlookers. In comparison, sex offender registration, whatever its impact on Ella, does not come close to a form of punishment recognized as cruel and unusual at the founding.

¶49 Under the second category, an offense may be deemed cruel[17] if it is "excessive" and "so disproportionate to the offense committed[] as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." See Ninham, 333 Wis. 2d 335, ¶85 (quoting State v. Paske, 163 Wis. 2d 52, 69, 471 N.W.2d 55 (1991)). This is a "high" bar. United States v. Juvenile Male, 670 F.3d 999, 1010 (9th Cir. 2012). For perspective, "the [United States] Supreme Court has upheld a life sentence for three theft-based felonies totaling a loss of about $230, a 25-year sentence for stealing golf clubs, a life sentence for

---

[17] We focus on the meaning of "cruel" because United States Supreme Court precedent does so while giving the word "unusual" much less attention. See id. at 48 ("[C]ourts and scholars have largely ignored the word or assigned it a weak meaning."). "Under its original meaning, the Cruel and Unusual Punishments Clause prohibits cruel innovations—that is, punishments that are unjustly harsh in light of long-standing prior practice." Id. at 42. Applying either the Court's precedent or the original understanding of the Clause results in the same conclusion: sex offender registration does not violate the Eighth Amendment.

28

possessing 672 grams of cocaine, and a 40-year sentence for possessing nine grams of marijuana." Carney, 875 F.3d at 1352 (citations omitted). This court has upheld a life sentence, without the possibility of parole, for a person convicted of first-degree intentional homicide who committed the crime at the age of 14. Ninham, 333 Wis. 2d 335, ¶¶4-5.

¶50 As the State persuasively argued, Ella's temporary inability to change her legal name is unlike anything that has ever been recognized as cruel, and no other aspect of sex offender registration approaches cruelty either. There is also nothing unusual about registration. As this court noted in Bollig, "[p]resently all 50 states have some type of sex offender registration and notification laws in effect." 232 Wis. 2d 561, ¶19 (citing Roe v. Farwell, 999 F. Supp. 174, 177 n.1 (D. Mass. 1998)).

¶51 Accepting Ella's argument would render Wisconsin an outlier, without justification. See, e.g., People v. Adams, 581 N.E.2d 637, 641 (Ill. 1991) (concluding Illinois's child sex offender registration scheme is not cruel and unusual); Juvenile Male, 670 F.3d at 1010 (concluding "SORNA's registration requirements do not violate the Eighth Amendment" in light of "the high standard that is required to establish cruel and unusual punishment"); In the Interest of T.H., 913 N.W.2d 578, 597 (Iowa 2018) (concluding Iowa's juvenile sex offender registration requirement is not cruel and unusual). We reject Ella's Eighth Amendment claim and apply the law as it has been

29

understood since the founding and as it has been uniformly interpreted for more than two centuries.

## IV. ELLA'S FREEDOM OF SPEECH CLAIM

### A. Ella's Argument

¶52 Ella also argues that requiring her to register as a sex offender violates her right to free speech under the First Amendment, which provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

¶53 As far as we can discern, Ella advances two theories: (1) "Ella's right to express her gender identity is expressive conduct protected by the First Amendment"; therefore, "[b]y preventing Ella from changing her name, registration prevents her from fully expressing her identity"; and (2) "registration not only prevents Ella from expressing her identity, it compels speech by forcing Ella to disclose her transgender status."

¶54 Ella's claim, as well as her theories in support of it, have evolved throughout this litigation. Before the circuit court, Ella did not advance an independent First Amendment claim, instead choosing to argue the statute violated her right to substantive due process because it purportedly restricted a number of her liberties, including her right to free speech. Before the court of appeals Ella raised a standalone First Amendment claim, but she was very particular in how she defined it: "Ella does not assert that the fundamental right is an

30

ability to change her name; she asserts a right to express her true identity, which is protected by the First Amendment." In support, Ella continued to cite the same substantive due process cases she presented to the circuit court, including Obergefell. Ella makes a similar argument to this court. At times, she seems to argue requiring her to register as a sex offender is unconstitutional; at other points, she seems to concentrate on her inability to legally change her name under Wis. Stat. § 301.47(2)(a).

¶55 Ella's distinction between "an ability to change her name" and "a right to express her true identity" appears to be semantical in this case because Wis. Stat. § 301.47(2)(a) is the only statute she complains infringes her right to expression. She does not claim, for example, that any statute prohibits her from dressing however she pleases, although she cites a case for the proposition that "a transgender woman's dressing in feminine clothing is expressive conduct protected by the First Amendment."[18]

¶56 Ella also alters her interpretation of the relevant statutes. The State conceded Ella is allowed to use an alias of her choosing in day-to-day affairs. As the State explained, while Wis. Stat. § 301.47(2)(a) declares registered sex offenders may not change their legal name, the very next

---

[18] Ella's Br. at 33 (citing Doe ex rel. Doe v. Yunits, No. 001060A, unpublished slip op., 2000 WL 33162199 (Mass. Super. Ct. Oct. 11, 2000), aff'd sub nom. Doe v. Brockton Sch. Comm., No. 2000-J-638, unpublished slip op., 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000)).

paragraph, (2)(b), provides sex offenders may not "[i]dentify . . . by a name unless the name is one by which the person is identified with the department of corrections." Another statute, Wis. Stat. § 301.45(2)(a)1., directs the DOC to include sex offenders' "aliases" in the registry. Reading these two statutes together, the DOC allows sex offenders to use an alias provided they notify the DOC.[19] Before the court of appeals, Ella acquiesced to this interpretation, although she did not think it was particularly relevant.[20] She described the legal issue as her inability to petition the circuit court, under Wis. Stat. § 786.36, for a legal name change, claiming "she either continues to suffer harm from maintaining a legal name that is discordant with her true identity or commits a felony by petitioning for a name change." The court of appeals

---

[19] Krebs v. Graveley, 2020 WL 1479189 *1 n.1 (E.D. Wis. Mar. 26, 2020), aff'd 861 F. App'x 671 (7th Cir. 2021) ("The Name-Change Statute does prohibit sex offenders from identifying themselves by a name not registered with the state. Wis. Stat. § 301.47(2)(b). But Plaintiff long-ago registered Karen as an alias for Kenneth, the name that appears on her judgment of conviction.").

[20] See, e.g., Ella's Ct. App. Reply Br. at 10 ("Nor does Ella's ability to informally go by a female-sounding name cure this problem. There is a meaningful distinction between the ability to informally identify as Ella and the ability to legally identify as Ella. As discussed, this creates an unconstitutional disconnect between Ella's ability to identify as a woman and the requirement to present legal documentation that does not match her true identity."); Ella's Ct. App. Suppl. Reply Br. at 5 ("The State's assertion that Ella's ability to informally identify as female cures any constitutional problem misses the point. There is a meaningful distinction between the ability to informally identify as Ella and the ability to legally identify as Ella.").

expressly relied on the reading advanced by the State and to which Ella did not object. C.G., 396 Wis. 2d 105, ¶28 ("She further contends that her ability to informally identify with a female-sounding name——as long as she notifies the registry that she uses such a name——is insufficient to protect her right to formally identify in that manner with a name other than her current legal name.").

¶57 Ella now changes her position, arguing for the first time, "[t]here are two ways to change ones' [sic] name in Wisconsin:  through formal petition under Wis. Stat. § 786.36, or through 'continuous and consistent use' under the common law."  Ella did not invoke the common law in the courts below. Nevertheless, she now suggests she may not continuously and consistently use an alias because such use might effectuate a common law name change, in violation of Wis. Stat. § 301.47(2)(a).  Neither her briefing before the court of appeals nor her petition for review addressed the nuanced implications of the common law with respect to this case. Accordingly, the State argued in its response brief that Ella forfeited this argument.  In Ella's reply brief, she made no attempt to rebut the State's forfeiture argument. See State v. Mercado, 2021 WI 2, ¶38 n.13, 395 Wis. 2d 296, 953 N.W.2d 337 ("The State argues that because Mercado did not dispute the State's forfeiture argument on appeal, Mercado conceded the argument. . . . We agree . . . . When a party does not respond to an argument, we may deem that argument conceded." (citation omitted)).

33

¶58 Although Ella forfeited this argument, we choose to address it.  We reject Ella's statutory interpretation.  The common law right to use an alias is distinguishable from the common law rule that continuous and consistent use of an alias effectuates a legal name change.  The plain text of the statute abrogated the latter rule but not the former right.

¶59 "At common law it was the rule that in the absence of statutory restriction, and where it is not done for a fraudulent purpose, one could lawfully change his name at will without proceedings of any sort, merely by adopting another name, and for all purposes the name thus assumed would constitute his legal name just as much as if he had borne it from birth." State v. Hansford, 219 Wis. 2d 226, 247-48, 580 N.W.2d 171 (1998) (citation omitted) (emphasis added); see also 32 Wis. Att'y Gen. Op. 203, 204-05 (1943) ("[I]t would seem apparent that one does not have any absolute inherent or natural right to change his name and do business thereunder.  It is generally stated that it is well settled that, in the absence of a statutory prohibition, a person may lawfully adopt any name he chooses."  (citations omitted)).

¶60 Ella is prohibited by statute from legally changing her name; however, under the plain language of the statute, the parties essentially agree she can use an alias but for the application of the common law.  Accepting this reading, which comports with the plain meaning of Wis. Stat. § 301.47(2), we conclude Ella can use an alias, but even if her use of that alias would otherwise be sufficiently "continuous and

34

consistent" to effectuate a legal name change if she were not a registered sex offender, by operation of law, her legal name would remain unchanged. Section 301.47(2) unambiguously changes the common law rule, but it does not clearly change the common law right. See Fuchsgruber v. Custom Accessories, Inc., 2001 WI 81, ¶25, 244 Wis. 2d 758, 628 N.W.2d 833 ("A statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute." (citing Maxey v. Redevelopment Auth. of Racine, 94 Wis. 2d 375, 399, 288 N.W.2d 794 (1980)); see also Estate of Miller v. Storey, 2017 WI 99, ¶111, 378 Wis. 2d 358, 903 N.W.2d 759 (Kelly, J., concurring/dissenting) ("A statute will be construed to alter the common law only when that disposition is clear." (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 318 (2012)). Although Ella's common law right to use a name of her choosing in day-to-day affairs has not been abrogated, the State will not recognize her by that name.

¶61 We accordingly analyze Wis. Stat. § 301.47(2)(a) as a prohibition on petitioning a circuit court for a legal name change, not a ban on using an alias. Under this view, § 301.47(2)(a) is nothing more than an exception to Wis. Stat. § 786.36, Wisconsin's statute governing legal name change petitions.

## B. Analysis

¶62 Because Ella is free to "use whatever moniker she chooses for personal or professional purposes," Matter of

35

<u>Miller</u>, 617 N.Y.S.2d 1024, 1026 (N.Y. Civ. Ct. 1994), her First Amendment argument is quite narrow: it concerns <u>only</u> her inability to legally change her name, not her ability to use a name of her choosing in the course of ordinary affairs.

### 1. The Novelty of Ella's Claim

¶63 Few courts have addressed this issue. Among those that have, none have held that a prohibition on changing a person's legal name, standing alone, implicates the right to free speech. If a person is free to use a different name in day-to-day affairs, statutory restrictions on changing a person's legal name have not been understood to restrict speech or expression.

¶64 In <u>Petition of Variable for Change of Name v. Nash</u>, a New Mexico trial court rejected the petitioner's request to change his legal name to "Fuck Censorship!" 190 P.3d 354, 355 (N.M. Ct. App. 2008). On appeal, the petitioner agued he had a First Amendment right "to call himself whatever he wishes" and that the denial constituted "improper government censorship[.]" <u>Id.</u> at 356. The New Mexico Court of Appeals rejected the petitioner's arguments, not only because "Fuck Censorship!" is obscene, but because the petitioner could use the name under the common law without any need to involve the State. <u>Id.</u> ("Petitioner is entitled to assume whatever name he desires, absent fraud or misrepresentation, but any statutory name change will be subject to the district court's scrutiny. Here . . . '[s]ince [Petitioner's] common law right to use the []name has not been abrogated . . . , none of his First

36

Amendment rights have been prejudiced." (quoted source omitted) (modifications in the original)).

¶65 The Nash court was persuaded by Lee v. Superior Court, 11 Cal. Rptr. 2d 763 (Ct. App. 1992). In that case, the petitioner sought to change his legal name to a racial epithet. Id. at 764. Like the petitioner in Nash, who wanted to make a political statement about censorship, the petitioner in Lee also wanted to make a political statement: specifically, he said he wanted to "steal the stinging degradation——the thunder, the wrath, shame and racial slur" associated with the word. Id. "He theorize[d] that his use of the name, with court approval, could be used to conquer racial hatred." Id.

¶66 The California Court of Appeals reasoned the petitioner could not force the judiciary to "lend the Great Seal of the State of California" to this cause. Id. It reasoned, "[a]ppellant has the common law right to use whatever name he chooses. . . . However, he has no statutory right to require the State of California to participate therein." Id. It concluded, "[s]ince appellant's common law right to use the surname has not been abrogated, . . . none of his First Amendment rights have been prejudiced. . . . The order only precludes the filing of the name with the Secretary of State. . . . Nothing more, nothing less." Id. at 768.

¶67 In Petition of Dengler, the petitioner sought to change his legal name to the number 1069. 246 N.W.2d 758, 759 (N.D. 1976). He explained that each numeral represented a particular concept of importance to him. For example, he said

37

the numeral 1 "stands for my concept of nature which manifests itself as one individual among the various forms of life." Id. He claimed he could not express his true identity in any way other than by using the name 1069. Id. at 760. The petition was denied.

¶68 On appeal, the North Dakota Supreme Court stated, "petitioner relied upon the First Amendment to the United States Constitution for the name change claiming under the freedom of speech provision he had a right to change his name. Petitioner, however, failed to give any convincing reason in support of his argument, and we are not aware of any." Id. at 761. The court upheld the trial court's decision because "to use the court or law to impose or force a number in lieu of a name upon society" went beyond "bordering on bizarre[.]" Id. at 764. The common law might have permitted the petitioner to use a number as his name, but the court would not "force its acceptance" on society, which is an effect, to a degree, of a legal name change when ordered by a court. Id.; see also Leone v. Comm'r, 933 N.E.2d 1244, 1254 (Ind. 2010) ("While the courts have a unique power to certify a name change, Hoosiers still may refer to themselves by any name they like. They may not, however, demand that government agencies begin using their new names without a court order. This dual structure recognizes the reality that names serve multiple purposes, both private and public." (internal citation omitted)).

¶69 Nash, Lee, and Dengler reflect judicial rejection of the notion that a legal name change implicates the freedom of

38

speech.[21] Inherent in each decision is the view that free speech is, generally, a negative right, like most rights secured by the Bill of Rights. Alston v. Redman, 34 F.3d 1237, 1247 (3d Cir. 1994) (explaining "the rights guaranteed by the Constitution of the United States are primarily negative in character, standing guard as vigilant sentinels at the perimeter of permissible state conduct. It is only at the time that the state seeks to invade this citadel of individual liberty that these constitutional guarantees can be summoned to battle." (internal citations omitted)). "This position has strong textual support in the Bill of Rights. The right of free speech, the right to be free from unreasonable searches and seizures, the right to be free from double jeopardy, the right to due process under the Fifth Amendment, all of these are framed as prohibitions on state conduct, rather than as commandments for state action." Id. In other words, the State cannot be compelled to recognize a name and change its records.[22] See Williams v. Racine Cnty.

---

[21] Although the dissent does not address any of these cases, it claims our analysis "goes against the tide of the relevant case law." Dissent, ¶116. If the dissent's assertion were correct, it would not have to cite multiple cases having nothing to do with the First Amendment to justify its desired outcome. See e.g., Obergefell v. Hodges, 576 U.S. 644 (2015) (substantive due process); Ford v. Wainwright, 477 U.S. 399 (1986) (cruel and unusual punishment); Hernandez-Montiel v. Immigr. & Naturalization Serv., 225 F.3d 1084, 1093 (9th Cir. 2000) (immigration law).

[22] States may have an affirmative duty to make certain places available for expressive conduct. David P. Currie, Positive and Negative Constitutional Rights, 53 U. Chi. L. Rev. 864, 879 (1986). Occasionally, advocates have tried to extend forum arguments to things produced by government, like

39

Cir. Ct., 197 Wis. 2d 841, 846, 541 N.W.2d 514 (Ct. App. 1995) ("Williams has no positive right to a name change. The fact that others have changed their names, or that one of his stated reasons for seeking the name change is religious in nature, does not create an affirmative right to the name change.").

¶70 "Self-expression does not require a court order." Miller, 617 N.Y.S.2d at 1026. "There is no constitutional or inherent right to compel legal sanction of a change of name, notwithstanding the right at common law to assume a new name so long as it is not for a fraudulent or illegal purpose." Leone, 933 N.E.2d at 1254 (quoting In re Hauptly, 312 N.E.2d 857, 862 (Ind. 1974) (Prentice, J., dissenting)). As even advocates seeking to expand First Amendment protections acknowledge, "denials of name-change petitions do not directly impose restrictions on the petitioners' speech. None of the difficulties faced by denied petitioners restrict[] something to which they are entitled based on their free speech rights. None of these difficulties in fact place limits on speech at all."

---

license plates and driver's licenses. These arguments have had limited success. See Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 214-19 (2015) (rejecting an argument that Texas specialty license plates create a forum for speech because the plates constitute government speech); Krebs, 2020 WL 1479189 *2 (refusing to address an underdeveloped argument that Wisconsin law had created a "limited public forum" for "changing one's name"). Because Ella does not raise this argument, which borders on being an entirely different claim, we need not address it further.

Julia Shear Kushner, Comment, The Right to Control One's Name, 57 UCLA L. Rev. 313, 337 (2009).[23]

## 2. Ella's Burden

¶71 Ella has a difficult burden, in light of the novelty of her claim, to persuade us that the name-change prohibition in Wis. Stat. § 301.47(2)(a) implicates her right to free speech by infringing her expressive conduct. Clark v. Comm. for Creative Non-Violence, 468 U.S. 288, 293 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."); see also Doe v. City of Lafayette, 377 F.3d 757 (7th Cir. 2004) (applying the burden discussed in Clark). If the prohibition does not infringe expressive conduct, no further First Amendment analysis is necessary. State v. Baron, 2009 WI 58, ¶16, 318 Wis. 2d 60, 769 N.W.2d 34.

¶72 Ella has not satisfied her burden. In a recent, analogous case, the Eastern District of Wisconsin explained:

> Plaintiff has failed to establish that Wisconsin's regulation of her ability to change her name implicates her First Amendment rights. The parties provide relatively scant attention to this matter. . . . Plaintiff chides Defendant for providing "no authority for its assertion that

---

[23] Kushner argued viewpoint discrimination, in the context of legal name changes, could implicate the right to free speech. We need not examine this issue further because Wis. Stat. § 301.47(2)(a) does not allow sex offenders to petition for some legal name changes but not others.

> regulating a person's name does not implicate the First Amendment."
>
> Plaintiff forgets who bears the burden of proof and persuasion on her claim. It is she, not Defendant, who must establish that regulating a person's name implicates the First Amendment.

Krebs v. Graveley, 2020 WL 1479189 *1 (E.D. Wis. Mar. 26, 2020), aff'd 861 F. App'x 671 (7th Cir. 2021) (internal citations omitted); see also In re Larson, No. A18-2153, unpublished slip op., 2019 WL 7286959 *3 (Minn. Ct. App. Dec. 30, 2019) (affirming a lower court's denial of a sex offender's petition to change his legal name to "Better Off Dead" because "[a]ppellant failed to provide specific authority regarding the free-speech right to change one's name under these circumstances, and there appears to be none" and therefore "the district court did not improperly reject appellant's freedom-of-speech argument and did not abuse its discretion by denying his name-change petition"). Ella's claim suffers from a similar defect defeating the claim advanced by the plaintiff in Krebs. The First Amendment has been a part of our Constitution since 1791. People changed their names even before then. Ella has been unable to cite binding or persuasive authority for the proposition that restrictions on legal name changes implicate protected speech.[24] We agree with the court of appeals, which

---

[24] Ella cites cases that are not on point. For example, she relies on Salaam v. Lockhart, 905 F.2d 1168 (8th Cir. 1990). In that case, a prisoner used a state court proceeding to legally change his name after he converted to Islam. Id. at 1169. The prison nonetheless refused to recognize his name change because of a policy "to use only committed names on prison records and clothing, and in the mail room." Id. The court held "that the

42

concluded that "Ella has therefore failed to meet her burden to prove that her First Amendment rights are implicated by the sex offender registry statute[.]" C.G., 396 Wis. 2d 105, ¶32; see also id., ¶31 (discussing Krebs).

### 3. Ella's Expressive Conduct Theory

¶73 Ella's argument rests on a faulty conception of expressive conduct. The act of presenting identification, either by vocalizing her legal name, writing it down, or handing government documents bearing her legal name to someone else, has never been considered a form of expressive conduct in either legal precedent or in the historical record. The act of producing identification is conduct unprotected by the First Amendment.

¶74 The United States Supreme Court has noted the Free Speech Clause's protection "extend[s] . . . only to conduct that is inherently expressive." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006) (emphasis added). Notably, conduct does not become expressive simply because it is accompanied by speech or involves the use of

---

state authorities must deliver mail to Salaam addressed to him only as Salaam and must allow the addition of Salaam's current name to his clothing. The state, however, need reform its record keeping only to the extent necessary to allow Salaam to receive services and information in his new name within the prison." Id. Salaam is not factually analogous to this case because Ella has not received a legal name change. Additionally, the State is not interfering with Ella's ability to use a name of her choosing, i.e., it is not placing a literal badge with a different name on her clothing and ordering her to wear it, as prison officials did in Salaam.

43

words. Id. at 62. For example, "Congress . . . can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." Id. "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949).

¶75 When Ella presents herself to the world as a woman, her conduct is expressive, but it becomes no less or more expressive depending on her legal name. "Ella has the right to use whatever name she chooses, provided she includes it in the sex offender registry." C.G., 396 Wis. 2d 105, ¶32. The expressive component of her transgender identity is not created by the legal name printed on her identification but by the various actions she takes to present herself in a specific manner, e.g., dressing in women's clothing, wearing make-up, growing out her hair, and using a feminine alias.

¶76 Whether conduct is expressive is partly an objective inquiry, which turns on how reasonable people——unfamiliar with the intent of the actor——would understand the conduct. Rumsfeld, 547 U.S. at 66 ("An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of

44

the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else."); see also Gul v. City of Bloomington, 22 N.E.3d 853, 859 (Ind. Ct. App. 2014) (rejecting a claim that a property owner had a First Amendment right not to mow his lawn as a mode of expression because "[t]here is nothing inherent to an overgrown yard that would lead an average person of ordinary sensibilities to conclude that any message at all was being conveyed, much less a specific environmental message").

¶77 A person observing Ella present herself as a woman would not understand her to be expressing herself as a man because the name printed on her driver's license is masculine; perhaps displaying her driver's license might cause the viewer to have doubts about whether Ella is biologically female, thereby inhibiting the success of her intended goal to be perceived as a woman. That impediment does not render the production of identification expressive conduct, however. See Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶61, 399 Wis. 2d 623, 967 N.W.2d 469 (explaining the right to freedom of speech does not entitle the speaker to a favorable outcome in her endeavor). While those who read her legal documents may realize she is transgender, that insight does not stop Ella from expressing herself in whatever manner she chooses. "Romeo would, were he not Romeo call'd, Retain that dear perfection which he owes Without that title[.]" Leone, 933 N.E.2d at 1252.

45

¶78 Taking Ella's argument to its logical conclusion, she would also compel the State to print on her driver's license that she is female because she self-identifies as a woman. Ella says the problem is not merely her inability to change her legal name but the impact the name-change prohibition has on her ability to identify as a woman. Ella quite clearly explained she wants the legal name change so she no longer has "to present legal documentation that does not match her true identity." Notably, Ella blurs any distinction between biological sex and gender identity, saying she identifies as "a transgender female," while at another point saying she "identifies as a woman[.]" If she cannot print "female" on her license, she will be outed as easily as she may be with a traditionally-masculine name printed on it.

¶79 Like biological sex, a legal name is a hallmark of identification. Although a person may use an alias for expressive purposes, the point of a legal name is to "tether one's name to a fixed identifier." Leone, 933 N.E.2d at 1254 (citation omitted); see also name, A Dictionary of the English Language (10th ed. 1792) ("The discriminative appellation of an individual." (emphasis added)). If the right to free speech included the prerogative to change one's legal name at will absent a compelling state interest prohibiting the name change, the very point of printing identifying information on documents would be undermined. Just like a legal name, the sex offender registry tracks other "[i]nformation sufficient to identify the person, including date of birth, gender, race, height, weight

46

and hair and eye color." Wis. Stat. § 301.45(2)(a)2. Ella offers no limiting principle that would grant her the constitutional right to change her legal name while other hallmarks of identification remain fixed.[25]

¶80 The historical record does not support Ella's argument for compelling the State to change her legal name. "[A] common-law name change carries with it no mandate to those with whom one comes in contact to accept at face value the nexus between the new name and the individual who assumes it. Persons who change their personal names may not necessarily demand that government agencies begin using their new names without a court order." 65 C.J.S. Names § 21 (updated Feb. 2022).

¶81 Around the time of the nation's founding, legal name changes were rejected by state governments for various reasons, and the historical record contains no suggestion that anyone thought the First Amendment was implicated. "A curious example of the quibbles into which the common law sometimes [fell] was developed by the use of single letters as names. It was many times held that while a vowel, being a complete sound in itself, was sufficient to constitute a name, a consonant, representing only part of a compound sound, could not so act." G.S. Arnold, Personal Names, 15 Yale L.J. 227, 228 (1905-06). These early cases, along with the scholarship examining them, lack even a hint that the founding generation understood government to be regulating expressive conduct, protected by the First Amendment.

---

[25] Ella has not advanced a forum argument. Supra ¶69 n.22.

47

Ella has not directed us to any historical sources from the founding that would support her argument, nor have we found any.

¶82 A nineteenth century English solicitor general is reported to have said, "[t]here was no law forbidding a man to change his name; but there was also no law which compelled his neighbour to acknowledge him under the name he might assume. . . . Everybody was at liberty, if he pleased, to change his surname, but no one else was obliged to recongise the change unless he pleased."  Herbert, ci-devant Jones, Change of Surname, in 1 The Herald & Genealogist, at 454, 463 (1863).  To the extent officials were "bound" to recognize a name, he suggested the rule derived from "convenience."  Id. at 463-64.  "There was no law on the subject; but when there appeared to be nothing arbitrary or improper, and when there was no encroachment on the feelings and rights of others, then it was courteous to accede to the wish of a person who might desire to change his name."  Id. at 464.

¶83 Other nineteenth century commentators took a different view, writing that all name changes were wholly the prerogative of the crown.  See A. C. F-D. & A.M.R., A Treatise on the Law Concerning Names and Changes of Names (continued), 2 Genealogical Mag., 537, 542 (1899) ("The gift of a name or a change of name is a matter of honour, in the prerogative of the Crown, and subject to the jurisdiction of the Courts of Honour. It is wholly outside the jurisdiction of the ordinary tribunals, which have no power to adjudicate upon the point.").  Contra T.E. Morris, The Re-Naming of Welshmen, in The Transactions of

48

the Honourable Society of Cymmrodorion, at 1, 18-19 (1901-02) (critiquing the notion that a name is a "gift" and "prerogative" of the crown).

¶84 The historical practice of applying to the crown for a legal name change, which the crown could deny, demonstrates the limited extent to which the government is <u>required</u> to effectuate a legal name change, regardless of whether other methods of accomplishing a legal name change did not require a direct appeal to the crown. <u>See</u> <u>Davies v. Lowndes</u>, 1 Bing. N. Cas. 597, 618 (1835) ("And there is no necessity for any application for a royal sign manual to change the name. It is a mode which persons often have recourse to, because it gives a greater sanction to it, and makes it more notorious.").

¶85 "In the 19th and 20th centuries express statutory provisions for changing names were enacted in many jurisdictions." <u>Hall v. Hall</u>, 351 A.2d 917, 922 (Md. Ct. Spec. App. 1976). In nearly all states, including Wisconsin, the decision of whether to grant a statutory petition for a legal name change has been committed to the sound discretion of the court. <u>Id.</u>; <u>see also</u> <u>Williams</u>, 197 Wis. 2d at 847. The fact that petitions may be denied under this discretionary standard strongly suggests a legal name change, as traditionally understood, does not implicate the freedom of speech. Ella seeks recognition of a new right, not a remedy to enforce a pre-existing right. <u>See</u> <u>Houston Cmty. Coll. Sys. v. Wilson</u>, 595 U.S. __, 142 S. Ct. 1253, 1259 (2022) (noting "no one before us has cited any evidence suggesting that a purely verbal

49

censure . . . has ever been widely considered offensive to the First Amendment"). A "[l]ong settled and established practice is a consideration of great weight." Id. (quoting The Pocket Veto Case, 279 U.S. 655, 689 (1929)) (modification in the original). "Often, 'a regular course of practice' can illuminate or 'liquidate' our founding document's 'terms & phrases.'" Id. (quoting Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)). The lack of historical precedent for Ella's position is fatal to her claim, particularly because she has the burden to persuade us that her expressive conduct is being infringed.

¶86 In dismissing our historical analysis, the dissent ignores the United States Supreme Court's similar originalist approach to First Amendment questions. Its recent unanimous decision in Houston Community College System is a prime example. See, e.g., id. at 1259 ("As early as colonial times, the power of assemblies in this country to censure their members was 'more or less assumed.' . . . The parties supply little reason to think the First Amendment was designed or commonly understood to upend this practice." (quoted source omitted)). Our "historical journey" in this opinion represents the accepted method for interpreting the First Amendment.

¶87 The dissent criticizes the court for examining the historical record in search of evidence suggesting the original meaning of the First Amendment protects legal name changes, advocating that "times change. Societies evolve. Instead of looking backward to esoteric sources to define the contours of

50

modern existence, we should instead look, as we do in other contexts, to 'evolving standards of decency that mark the progress of a maturing society.'"[26] These sentiments reflect the philosophy of living constitutionalism, which would rewrite the Constitution to reflect the views and values of judges. Exploring the historical record is more than "interesting"——it is impossible to ascertain the meaning of a constitutional provision without undertaking this analysis. See Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 59 (1868) ("We cannot understand these provisions unless we understand their history."). This method enables judges to discern the original public meaning of the text, which is fixed.

¶88 The alternative approach, embraced by the dissent, undermines democracy. "When government-adopted texts are given a new meaning, the law is changed; and changing written law, like adopting written law in the first place, is the function of the first two branches of government. . . . Allowing laws to be rewritten by judges is a radical departure from our democratic system." Scalia & Garner, Reading Law, at 82-83 ("[T]he living Constitution is genuinely corrosive of the fundamental values of our democratic society." (citing William H. Rehnquist, The Notion of a Living Constitution, 54 Tex. L. Rev. 693, 706 (1976))).

---

[26] Dissent, ¶111.

¶89 In comparison to the objective standards by which originalism allows us to understand the meaning of the constitutional text, the living constitutionalism espoused by the dissent leaves unanswered the question of why it "makes sense for us to" change the meaning of the First Amendment, and by what authority judges (as opposed to the people) may decide to change the law. See McDonald v. City of Chicago, 561 U.S. 742, 803 (2010) (Scalia, J., concurring) (noting living constitutionalism "empowers judges to eliminate or expand what the people have prescribed"). Even if "evolving standards" could change the meaning of the Constitution, why should "Justices' notions" of what the First Amendment "ought to mean" prevail over "the democratically adopted dispositions of our current society?" McCreary County v. Am. C.L. Union of Ky., 545 U.S. 844, 899 (2005) (Scalia, J. dissenting). Fundamentally, the dissent's proposed "constitutional revision by" the judicial branch "accompanied (as it is today) by extravagant praise of liberty," would "rob[] the People of the most important liberty they asserted in the Declaration of Independence and won in the Revolution of 1776: the freedom to govern themselves." Obergefell, 576 U.S. at 714 (Scalia, J., dissenting). Our job is not "to define the contours of modern existence"[27] but to declare the meaning of the law——in this case, the supreme law of the land.

---

[27] Id.

52

¶90 It is a "caricature of originalism," Scalia & Garner, Reading Law, at 85, to reject it because, as the dissent argues, "[a]t the time of the founding . . . transgender rights were the furthest thing from the founders' minds."[28] "Drafters of every era know that . . . the rules they create will one day apply to all sorts of circumstances that they could not possibly envision[.]" Id. at 86. While transgenderism is a modern concept, changing one's name is not.

¶91 The dissent seems to disparage the Constitution (or at least its fixed meaning) because "[a]t the time of the founding Black people could be considered property and women had no rights[.]"[29] More than 150 years ago, the people constitutionally adopted equality under the law. U.S. Const. amends. XIII-XV. As but one abominable example of judges "who reject the meaning of the Constitution as enacted and wish to substitute another meaning that they contend is superior," Randy E. Barnett, Restoring the Lost Constitution: The Presumption of Liberty 96 (2004), the United States Supreme Court in Plessy v. Ferguson abandoned the constitutional guarantee of equality in favor of its own "conception of individual rights and who is entitled to those rights."[30] Judges are not reliable protectors of individual rights or liberty when they seek to replace the original meaning of the Constitution with their own notions of

---

[28] Id., ¶110.

[29] Id.

[30] Id., ¶109.

53

the way things ought to be. "Only the Constitution can serve as a reliable bulwark of the rights and liberty of the people." State v. Roberson, 2019 WI 102, ¶86, 389 Wis. 2d 190, 935 N.W.2d 813 (Rebecca Grassl Bradley, J., concurring). For this reason, we must apply the Constitution's original meaning, and not what we may wish it to mean.

### 4. Ella's Compelled Speech Theory

¶92 Although in the course of day-to-day affairs Ella may have to "present[] legal documentation," she does not explain how presenting legal documentation bearing a "male-sounding name" constitutes compelled speech. This theory fails for the same reason her first theory does: identifying one's self is an act, not a mode of expression. "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Rumsfeld, 547 U.S. at 62 (quoting Giboney, 336 U.S. at 502). "[W]ords can in some circumstances violate laws directed not against speech but against conduct." Id. (quoting R.A.V. v. St. Paul, 505 U.S. 377, 389 (1992)). Again, Ella offers no limiting principle. When the government requires a person to accurately list her hallmarks of identification on a tax form, the government does not compel her to speak but merely to produce information; Ella's claim is indistinguishable. United States v. Arnold, 740 F.3d 1032, 1034-35 (5th Cir. 2014) (explaining the Eighth Circuit had "rejected a claim that compelled

54

disclosure of information on an IRS form [i]s unlawful compelled speech" and applying the Eighth Circuit's logic to reject a compelled speech challenge to a law requiring sex offenders to register their residence (quoting United States v. Sindel, 53 F.3d 874, 878 (8th Cir. 1995))).

¶93 The State did not give Ella her legal name——her parents did. Cf. Mutawakkil v. Huibregtse, 735 F.3d 524, 526 (7th Cir. 2013) ("He insists that Wisconsin's policy violates the equal protection clause, even if not the first amendment, because he thinks that 'Norman C. Green, Jr.' sounds like a white man's name, and he is not white. Yet it is the name his parents gave him; it was not forced on him by the state."). The State has not branded Ella with her legal name, and when Ella presents a government-issued identification card, she is free to say nothing at all or to say, "I go by Ella."

## V. CONCLUSION

¶94 Under well-established precedent, Ella's claims fail. Sex offender registration does not violate the Eighth Amendment because it is not punishment, nor is it cruel or unusual, particularly in light of Ella's offense for which the law requires her registration. Ella's First Amendment right to free speech does not encompass the power to compel the State to facilitate a change of her legal name. Producing one's legal name is properly understood as conduct, subject to government regulation, not speech.

*By the Court.*——The decision of the court of appeals is affirmed.

¶95 BRIAN HAGEDORN, J. *(concurring).* I agree with the majority/lead opinion that C.G.'s First and Eighth Amendment challenges to the name-change prohibition in the sex-offender registry fail.[1] See Wis. Stat. § 301.47(2). Accordingly, I join the opinion in most respects.[2] I write separately to make three points.

¶96 First, the majority/lead opinion's analysis of C.G.'s as-applied Eighth Amendment claim is improper. When analyzing an Eighth Amendment claim, we are bound to apply United States Supreme Court precedent. The Court has instructed that the intent-effects test must be used to determine if a sanction is punitive. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-70 (1963). This test considers whether a particular statutory scheme is punitive on its face, not whether its application to a particular person might be unduly harsh. Seling v. Young, 531 U.S. 250, 263 (2001). Looking to a statute's implementation or person-specific effects "would prove unworkable" and is flatly inconsistent with the test's focus on the face of the statute. Id.; see also id. at 272-73 (Thomas, J., concurring). We said as much just last term, explaining that the intent-effects test "must be applied on the face of the statute, rather than to the facts and circumstances of an individual defendant." State v. Schmidt, 2021 WI 65, ¶30, 397 Wis. 2d 758, 960 N.W.2d 888.

---

[1] Wisconsin Stat. § (Rule) 809.81(8) requires that in cases like this we should "refer to individuals only by one or more initials or other appropriate pseudonym or designation." I refer to the defendant as "C.G." following our case caption.

[2] I join the court's opinion except for ¶6 and ¶¶36-46.

1

¶97 The majority/lead opinion correctly identifies this principle, but then devotes several pages to an analysis of a claim that the Supreme Court has called unworkable. Majority/Lead op., ¶¶35-45. Analyzing the effects of the statutory scheme on C.G. personally is antithetical to the intent-effects test we must apply. This discussion does not add clarity by analyzing an alternative claim; it increases confusion by conducting an analysis that cannot be done for a claim that does not exist. The better approach is simply to reaffirm that the statutory scheme at issue here is not punitive, and leave it there. See State v. Hezzie R., 219 Wis. 2d 848, 881, 580 N.W.2d 660 (1998); State v. Bollig, 2000 WI 6, ¶27, 232 Wis. 2d 561, 605 N.W.2d 199.

¶98 Second, it is important to note the limited nature of our resolution of C.G.'s First Amendment challenge. C.G. has failed to prove that the prohibition on name changes for individuals on the sex offender registry infringes on C.G.'s First Amendment right to freedom of speech. In the absence of on-point case law, supportive historical evidence, or a compelling argument, we cannot conclude——for what would appear to be the first time in American history——that a person's legal name contains expressive content subject to the First Amendment's free speech protections. As the majority/lead opinion explains, the prohibition on changing a legal name does not prohibit a sex offender from saying or communicating a preferred name, nor does it mandate the communication of any particular content. It is possible that some name-related

2

claims could implicate a person's free speech rights or trigger other constitutional protections. But based on the arguments and the precise claims before us, I am unpersuaded that the prohibition in Wis. Stat. § 301.47(2) on changing one's name while subject to the sex-offender registry's reporting requirements involves any expressive conduct triggering the First Amendment's free speech protections.

¶99 Finally, I write separately to address a sensitive matter. The majority/lead opinion explains that it uses "female pronouns out of respect for Ella's individual dignity," acknowledging "[n]o law compels our use of Ella's preferred pronouns; we use them voluntarily." Majority/Lead op., ¶6 & n.9. The dissent and the court of appeals make the same editorial decision. Whether to use an individual's preferred pronouns, rather than those consonant with one's biological sex, presents ontological and moral questions about our identity as human beings. It is a matter deeply personal to those who wish to be called by certain pronouns, and to many who are asked to call others by their preferred pronouns. See, e.g., Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021).

¶100 These relatively new cultural debates are, in the main, not questions courts are well-equipped to answer. As a court of law, we should do our best to remain agnostic regarding debates where the law does not supply an answer. This is motivated in part by the modest nature of the judicial role, and in part out of the prudential concern that these contested moral matters could soon become contested legal matters. The court's

3

decision to use female pronouns could be misread as suggesting that someone who identifies as a female is in fact a female, under the law or otherwise. See also United States v. Varner, 948 F.3d 250, 254-58 (5th Cir. 2020) (presenting additional reasons why the court's use of a party's preferred pronouns could prove problematic). We should aim to avoid any unintended legal consequences of our language choices.

¶101 C.G.'s decision to identify as a woman is grounded in a particular way of understanding sex and gender——one rooted in a person's individual sense of identity. This view is a departure from what was widely accepted just a few years ago and is by no means universally shared today. Without question, C.G. should be treated with the same dignity and respect as any other litigant before this court. But I believe we would do well to remain scrupulously neutral rather than assume that pronouns are for choosing. These matters of grammar have downstream consequences that counsel caution, particularly as a court of law where such decisions could have unknown legal repercussions.

¶102 For these reasons, I respectfully concur.

4

¶103 ANN WALSH BRADLEY, J. *(dissenting).* Ella is a transgender woman seeking to express herself by changing her[1] name to reflect her gender identity in the face of a statute that precludes it. One aspect of sex offender registration is that a person subject to the registry cannot undergo a legal name change. See Wis. Stat. § 301.47(2)(a). Ella challenges that restriction.

¶104 At birth, Ella was assigned male, and her legal name is traditionally masculine. Ella wishes to legally change her name to a traditionally feminine name to correspond to her gender identity. Specifically, Ella challenges the restriction as applied to her on the basis of the First and Eighth Amendments to the United States Constitution.

¶105 Although I agree that Ella's Eighth Amendment claim fails, I write separately to address the majority's First Amendment analysis and conclusions. It cuts short the First Amendment analysis by determining that the First Amendment isn't even implicated by the name change ban that accompanies Ella's

---

[1] This dissent refers to Ella using her preferred pronouns. The concurrence disagrees with this decision and refers to Ella by her former masculine name (albeit with initials), citing the avoidance of "unintended legal consequences." Concurrence, ¶100. However, its generalized speculation does not specifically identify any legal consequences supposedly implicated.

I remain unpersuaded by the specter of unidentified legal consequences. Rather, like the majority/lead opinion, I refer to Ella using her preferred pronouns "out of respect for Ella's individual dignity." Majority/lead op., ¶6.

1

registration as a sex offender. In making this determination, the majority takes an overly restrictive view of expressive conduct and denigrates the import of a legal name.

¶106 Admittedly, the facts of the underlying offense indicate a "serious and forceful" attack, but that is not the question presented here. See majority/lead op., ¶44.[2] Rather the question boils down to whether the State has met its burden to show that this statutory restriction is narrowly tailored to serve a significant government interest——as applied to Ella. If not, then such a restriction cannot be constitutionally applied to Ella's circumstances.

¶107 The majority fails to answer this question. It arrives at a result that is contrary to First Amendment precedent and discounts the burdens Ella faces as a result of the restriction. Under the analysis that the majority should have conducted, I conclude that Ella has established a violation of her First Amendment rights and that the State has not met its burden to demonstrate that Ella should be categorically banned from filing a petition for a name change.

¶108 Accordingly, I respectfully dissent.

---

[2] I cite Justice Rebecca Grassl Bradley's opinion as a "majority/lead" opinion because the opinion in its entirety has not garnered a majority vote of the court. See concurrence, ¶95 n.2; Koss Corp. v. Park Bank, 2019 WI 7, ¶76 n.1, 385 Wis. 2d 261, 922 N.W.2d 20 (Ann Walsh Bradley, J., concurring). However, the First Amendment analysis that this dissent takes issue with is joined by four members of the court, so I therefore refer in the body of this dissent to the "majority" when discussing the court's conclusions with regard to the First Amendment.

I

¶109 At the outset I observe that although the majority's historical journey back to the 18th and 19th centuries is interesting, it is misplaced. In denying that Ella's choice of name implicates the First Amendment, the majority attempts to support its determination with reference to a "nineteenth century English solicitor general," nineteenth century commentators on English law, and practices prevailing at the time of the founding. See majority/lead op., ¶¶81-84. With all due respect, we are in the 21st century and our conception of individual rights and who is entitled to those rights has thankfully changed in the two centuries since these sources were germane. See Obergefell v. Hodges, 576 U.S. 644, 660-63 (2015).

¶110 It is no wonder the majority finds no protection for Ella in these sources. At the time of the founding Black people could be considered property and women had no rights——transgender rights were the furthest thing from the founders' minds.

¶111 But times change. Societies evolve. Instead of looking backward to esoteric sources to define the contours of modern existence, we should instead look, as we do in other contexts, to "evolving standards of decency that mark the progress of a maturing society." Ford v. Wainwright, 477 U.S. 399, 406 (1986).

¶112 In this maturing society, it makes sense for us to recognize the expressive power of a name. Just as there is a First Amendment interest in a religious name, there is a First

3

Amendment interest in a name that aligns with one's gender identity.

¶113 The threshold question for the analysis of Ella's First Amendment argument is whether the First Amendment is implicated. It is in answering this question that the majority goes astray, and I thus address this question first in this dissent. Subsequently, I conduct the analysis the majority should have completed, addressing the appropriate level of scrutiny that should guide our analysis and applying that level of scrutiny to the statute at issue in Ella's as-applied challenge.

II

¶114 The majority's First Amendment analysis quickly veers down the wrong path with its determination that the First Amendment is not even implicated by a ban on name changes. Majority/lead op., ¶72.

¶115 In the majority's view, "Ella's argument rests on a faulty conception of expressive conduct." Id., ¶73. This is so, says the majority, because "[t]he act of presenting identification, either by vocalizing her legal name, writing it down, or handing government documents bearing her legal name to someone else, has never been considered a form of expressive conduct in either legal precedent or in the historical record." Id. Thus, the majority takes a narrow view of expressive conduct, concluding that "[t]he act of producing identification is conduct unprotected by the First Amendment." Id. The majority further attempts to explain:

4

> When Ella presents herself to the world as a woman, her conduct is expressive, but it becomes no less or more expressive depending on her legal name. . . . The expressive component of her transgender identity is not created by the legal name printed on her identification but by the various actions she takes to present herself in a specific manner, e.g., dressing in women's clothing, wearing make-up, growing out her hair, and using a feminine alias.

Id., ¶75. Accordingly, the majority concludes that "identifying one's self is an act, not a mode of expression." Id., ¶92.

¶116 The majority's conclusion is erroneous as a matter of precedent and discounts the personal burdens the name change ban foists on Ella. Contrary to the majority's view, the proposition that a name is not expressive conduct implicating the First Amendment goes against the tide of the relevant case law.

¶117 Conduct is expressive if it "possesses sufficient communicative elements to bring the First Amendment into play." Texas v. Johnson, 491 U.S. 397, 404 (1989). This inquiry is informed by whether conduct has the "intent to convey a particularized message." Id. Changing one's name to reflect a certain personal identity fits the bill.

¶118 A name can convey a person's family history, cultural heritage, or religious devotion. And a name most certainly can convey one's gender identity. It is a fundamental way a person presents themselves to the world and is essential to a person's

5

identity.[3]  Calling a person by that person's chosen name indicates respect for that person's dignity and autonomy.

¶119 One need look no further than the daily news and recent history to find a litany of name changes, the purpose of which is to express an essential piece of a person's identity. Cassius Clay became Muhammad Ali.  Bruce Jenner became Caitlyn Jenner.

¶120 When Cassius Clay changed his name to Muhammad Ali, he did so not only to convey a religious identity, but to shed the "slave name" he was given at birth.  Similarly, when Bruce Jenner became Caitlyn, she did so to express an essential piece of her identity——her gender identity.  These "particularized messages" are certainly worthy of the label of "expressive conduct."

¶121 "The First Amendment serves not only the needs of the polity but also those of the human spirit——a spirit that demands self-expression.  Such expression is an integral part of the development of ideas and a sense of identity."  Procunier v. Martinez, 416 U.S. 396, 427 (1974) (Marshall, J., concurring). To deny the applicability of the First Amendment to protect the expression of one's personal name in this as-applied challenge

---

[3] See Yofi Tirosh, A Name of One's Own:  Gender and Symbolic Legal Personhood in the European Court of Human Rights, 33 Harv. J. L. & Gender 247, 255 (2010) ("Names——surnames included——play a constitutive role in one's personhood (defining for oneself and for one's social world a set of affiliations with past generations and with present family) . . . ."); Kif Augustine-Adams, The Beginning of Wisdom is to Call Things by Their Right Names, 7 S. Cal. Rev. L. & Women's Stud. 1, 1 (1997) ("Naming practices reflect conceptions of individuality, equality, family and community that are fundamental to identity.").

gives short shrift to the expressive nature of a name and the dignity that the recognition of it carries. See id. ("To suppress expression is to reject the basic human desire for recognition and affront the individual's worth and dignity.").

¶122 Courts have previously recognized the right to use a religious name, declaring that "[a] personal name is special." Salaam v. Lockhart, 905 F.2d 1168, 1170 (8th Cir. 1990). Indeed, "It may honor the memory of a loved one, reflect a deep personal commitment, show respect or admiration for someone famous and worthy, or . . . reflect a reverence for God and God's teachings." Id. "Like a baptism, bar mitzvah, or confirmation, the adoption of a new name may signify a conversion and the acceptance of responsibilities of membership in a community." Id. Accordingly, in the context of a religious name, it has been established that "an inmate has a First Amendment interest in using his religious name, at least in conjunction with his committed name." Malik v. Brown, 71 F.3d 724, 727 (9th Cir. 1995) see also Salaam, 905 F.2d at 1170 n.4 (quoting Felix v. Rolan, 833 F.2d 517, 518 (5th Cir. 1987) (per curiam)) ("The adoption of Muslim names by inmates practicing that religion is generally recognized to be an exercise of both first amendment speech and religious freedom." (Emphasis added)).

¶123 These cases regarding religious names are a useful analogue to Ella's claim here. Both a religious name and a name that conforms to one's gender identity involve fundamental aspects of a person's identity that are conveyed through the

7

medium of a name. As the Eighth Circuit said in <u>Salaam</u>, a name may "honor," "reflect," or "signify" essential elements of a person's identity. <u>Salaam</u>, 905 F.2d at 1170. In other words, a name may "express" such elements so as to implicate the First Amendment's protections of expressive conduct.

¶124 Similarly, the United States Supreme Court has declared that "[t]he Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." <u>Obergefell</u>, 576 U.S. at 651-52. Additionally, the Ninth Circuit has said: "Sexual identity is inherent to one's very identity as a person." <u>Hernandez-Montiel v. Immigr. and Naturalization Serv.</u>, 225 F.3d 1084, 1093 (9th Cir. 2000). It is "so fundamental to one's identity that a person should not be required to abandon [it]." <u>Id.</u>

¶125 Yet the majority requires Ella to abandon her gender identity in any situation involving official documents. The court of appeals' assertion, apparently adopted by the majority, that "Ella has the right to use whatever name she chooses," rings hollow. Majority/lead op., ¶75 (citing <u>State v. C.G.</u>, 2021 WI App 11, ¶32, 396 Wis. 2d 105, 955 N.W.2d 443). Even if Ella can use her feminine name in daily life, her driver's license, passport, applications for public assistance, and any other government document still require her to use her former

8

masculine name.[4]  In other words, the government requires that she express her fundamental identity as something she is not. See Jessica A. Clarke, They, Them, and Theirs, 132 Harv. L. Rev. 894, 951 (2019) ("Identity documents such as passports, driver's licenses, and birth certificates can also play a meaningful role in a person's conception of self.").

¶126 The majority seeks support for its result in the Eastern District's recent determination in Krebs v. Graveley, 2020 WL 1479189 (E.D. Wis. Mar. 26, 2020), and the Seventh Circuit's affirmance of that decision.  Krebs v. Graveley, 861 F. App'x 671 (7th Cir. 2021).  Krebs does not stand for the broad proposition the majority asserts.  It is true that Krebs involves facts similar to those here:  Krebs is a transgender woman, named Kenneth at birth, seeking to legally change her name to Karen.  She cannot do so because she is a convicted sex offender and is prohibited from legally changing her name.

¶127 Krebs argued that the name change statute violated her First Amendment right in four ways:  (1) it constitutes compelled speech, (2) it restricts speech in a limited public forum, namely the forum provided by Wisconsin for changing one's name, (3) it regulates expressive conduct, and (4) the statute

---

[4] "In the last few decades, and particularly since the passage of the REAL ID Act of 2005, most everything people do is subject to identification and subsequent recordation——from opening a bank account or applying for a credit card to receiving healthcare, buying alcohol, or taking an Amtrak train."  Adam Candeub, Privacy and Common Law Names:  Sand in the Gears of Identification, 68 Fla. L. Rev. 467, 469 (2016) (footnote omitted).

fails rational basis review. The Krebs opinion is certainly not a legal exegesis on these issues.

¶128 Rather than squarely addressing the merits of Krebs's claim, the district court rested its determination on Krebs's failure to meet her burden and the rank inadequacy of the briefing: "The Court will not engage in any such analysis in this case, owing to the fact that Plaintiff has failed to establish that Wisconsin's regulation of her ability to change her name implicates her First Amendment rights. The parties provide relatively scant attention to this matter." 2020 WL 1479189 at *1. "Plaintiff's only support for her position is a decade-old, student-written law review article. This is not legal precedent at all. It is a wholly insufficient legal basis for the Court to agree with Plaintiff's viewpoint." Id. at *2 (citation omitted).

¶129 Notably, the district court went out of its way to say that its holding was limited by the parties' arguments: "The Court stresses the limitations of this holding. It is based entirely upon the briefing presented in this case by these parties." Id. The court expanded in a footnote:

> Plaintiff's claim presents important and evolving issues for our society. To be unable to address the matter because of poorly constructed and researched arguments seems a waste of time for all involved. But as explained in Kay v. Board of Education of City of Chicago, 547 F.3d 736, 738 (7th Cir. 2008), when a "[district] judge [acts] sua sponte, the parties [are] unable to provide their views and supply legal authorities. The benefit of adversarial presentation is a major reason why judges should respond to the parties' arguments rather than going off independently." It is for the parties, not the Court,

10

> to carefully select and craft the arguments they will present to support their positions.

Id. at *2 n.3.  The Seventh Circuit affirmed the district court, again making its determination based on the inadequacy of briefing.  861 F. App'x at 674.

¶130 Here, in contrast, the issue has been more than adequately briefed.  The parties have been ably represented by counsel on both sides and we have heard extensively from amici.  The arguments are developed and the case cannot be summarily dispatched for the same reason the Krebs court dismissed that case.  Contrary to the majority's assertion, Ella's arguments do not suffer from the "similar defect" as those of Krebs.  See majority/lead op., ¶72.  As the district court observed, Krebs's arguments were practically nonexistent.  As analyzed above, unlike the plaintiff in Krebs, Ella has met her burden to demonstrate that her First Amendment rights are implicated by the name change ban.

### III

¶131 Having determined that the First Amendment is implicated by the sex offender registry's name change ban, the next question, left unaddressed by the majority, is the appropriate level of scrutiny to apply.

¶132 In this endeavor, we must examine whether the state regulation at issue is content-based or content-neutral.  State v. Baron, 2009 WI 58, ¶14, 318 Wis. 2d 60, 769 N.W.2d 34.  This is important because "[a] content-based statute must survive strict scrutiny whereas a content-neutral statute must survive only intermediate scrutiny."  Id.

11

¶133 Generally, a law is content-based if it distinguishes favored speech from disfavored speech on the basis of the ideas or views expressed. Id., ¶32. On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are generally content neutral." Id. (citation omitted).

¶134 The name change ban does not regulate based on the content of the conduct. Instead, it affects all content equally. Name changes based on religion are treated the same as name changes based on gender identity, which are treated the same as name changes "just because." The statute does not favor one reason for a name change over another, or one name over another, but bans all equally regardless of the motivation or content.

¶135 Accordingly, I conclude that the name change ban is content-neutral. Because it is content-neutral, intermediate scrutiny applies. Id., ¶14.

IV

¶136 Having determined that intermediate scrutiny is the proper framework for analyzing Ella's challenge, I turn next to apply that framework, an analysis that, again, the majority failed to conduct.

¶137 "The intermediate scrutiny test allows the government to impose reasonable, content-neutral restrictions on speech that are 'narrowly tailored to serve a significant governmental interest.'" State v. King, 2020 WI App 66, ¶23, 394 Wis. 2d 431, 950 N.W.2d 891. "A condition need not be the least

12

restrictive means of advancing the government's interests in order to satisfy the 'narrowly tailored' requirement of intermediate scrutiny. Rather, the standard is met so long as the restriction 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Id. (citation omitted). We must additionally consider the burdens of the regulation on free expression:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

United States v. O'Brien, 391 U.S. 367, 377 (1968). The burden is on the State to demonstrate that the statute is constitutional as applied to Ella. Baron, 318 Wis. 2d 60, ¶14.

¶138 Ella asserts that the registration requirement that she not legally change her name fails this test as applied to her because there is no substantial government interest in subjecting her to the restriction and the corresponding burden on her is significant. She contends that she is a low risk to reoffend, she has no conduct disorder or personality disorder, and law enforcement already has her preferred name listed as an alias in its records. Ella further contends that being required to continue to use her former masculine name exposes her to discrimination, mistreatment, and even physical violence.

¶139 The State, on the other hand, asserts that the name change ban furthers a significant governmental interest in

13

protecting the public and assisting law enforcement. It additionally argues that the regulation is sufficiently tailored to achieve this interest. Specifically, the State contends that law enforcement's ability to successfully track sex offenders would be hampered absent the name change ban and that without the ban those on the registry could create confusion by repeatedly changing their names, especially if they used common names. The State additionally argues that Ella's specific circumstances do not alter the result. Despite the fact that Ella was a juvenile when she was adjudicated delinquent, the State argues that law enforcement has a substantial interest in being able to quickly locate and identify Ella while she is on the registry.

¶140 I agree with Ella. The State completely discounts the burdens that Ella specifically faces from being categorically unable to change her name (and the majority doesn't even address the question). These severe and acute burdens manifest due to both Ella's gender identity and her age.

¶141 The name change ban that accompanies sex offender registration means that every time Ella has to complete an official task, she must use a name that is inconsistent with who she is. Any time she has to show a state-issued identification, she is forced to identify herself as someone she is not. If she applies for a public benefits program, checks into a hotel, boards an airplane, or begins a new job, she must present official documents that are inconsistent with her very identity. See Clarke, supra ¶125, at 951.

14

¶142 Further, requiring Ella to maintain a name that is inconsistent with her gender identity and forcing her to out herself every time she presents official documents exposes her to discrimination and abuse. Sadly, such a concern is not merely theoretical. "In a recent survey, 82 percent of transgender Wisconsinites reported experiencing harassment or mistreatment in the workplace. Significant numbers also reported that they were discriminated against based on their gender identity: 54 percent were not hired, 34 percent lost a job, and 22 percent were denied a promotion." Joseph S. Diedrich, Transgender Rights in Wisconsin, Wis. Law., Mar. 2018, at 26;[5] see also Lisa R. Miller and Eric Anthony Grollman, The Social Costs of Gender Nonconformity for Transgender Adults: Implications for Discrimination and Health, 30 Socio. F. 809, 826 (2015) (indicating that transgender people who have transitioned report prejudice and discrimination "especially if their legal documents do not reflect their present gender identity").

¶143 These burdens are exacerbated by Ella's young age. As she is just getting her footing in an independent life (a difficult endeavor for any person regardless of gender

---

[5] See also Ryan K. Blake, Transgender Rights are Human Rights: A Contemplation of Litigation Strategies in Transgender Discrimination Cases, 33 Wis. J. L. Gender & Soc'y 107, 115 (2018) (citing statistics indicating that unemployment for transgender survey respondents was twice the national average).

identity), she must also face the threat of discrimination every time she simply uses a government identification.[6]

¶144 With regard to abuse, Ella's fears are similarly well-founded. The record reflects that Ella was subjected to physical violence due to her gender identity while incarcerated.[7] Underscoring the uphill climb Ella faces in having her dignity recognized, the Department of Corrections appallingly blamed Ella for her own attack, stating essentially that she made herself a target.

¶145 On the flip side, the benefit to the State in requiring Ella to retain her former masculine name is minimal. The easy tracking that the name change ban is purported to foster would not be affected in the slightest by Ella changing her name for the simple reason that law enforcement already has

---

[6] See Sonja Shield, The Doctor Won't See You Now: Rights of Transgender Adolescents to Sex Reassignment Treatment, 31 N.Y.U. Rev. L. & Soc. Change 361, 362 (2007) ("The dangers that transgender youth face during their adolescent years are numerous, scarring, and often have permanent repercussions."); Julia C. Oparah, Feminism and the (Trans)gender Entrapment of Gender Nonconforming Prisoners, 18 UCLA Women's L. J. 239, 248 (2012) (explaining that certain burdens can be "exacerbated for transgender youth under 18 years old, and those under criminal justice supervision who need permission from a parent/guardian or warden or parole officer in order to change either their name or gender").

[7] Ella's experience is tragically commonplace. Data indicates that transgender inmates are more likely to suffer violence while incarcerated and that almost 40 percent of transgender inmates experience sexual victimization while incarcerated compared to four percent of all inmates. Stephanie Saran Rudolph, A Comparative Analysis of the Treatment of Transgender Prisoners: What the United States Can Learn from Canada and the United Kingdom, 35 Emory Int'l L. Rev. 95, 109-10 (2021).

16

<u>"Ella" listed as an alias</u>. All that a name change would seemingly require from law enforcement's perspective is to switch Ella's current legal name with an alias that is already on file. Law enforcement would still have both names and would still tie them to the same person. The burden is purely administrative, which pales in comparison to the burdens placed on Ella.

¶146 The State's argument ultimately falters in its consideration of Ella's as-applied challenge by discounting the burdens the name change ban places on Ella specifically. In light of the burdens Ella faces due to the name change ban, the State's "interest" is insignificant. Where the government already knows Ella's preferred name and ties it to her in any database search, I am unpersuaded that the State has met its burden that she should be categorically banned from making that name her legal name, especially given the severe and acute burdens Ella cites.

¶147 Does my conclusion mean that Ella can legally change her name, case closed? No. If she wishes to follow through on changing her name, she must still petition the circuit court in her county of residence to legally change her name. Wis. Stat. § 786.36. Before legally changing Ella's name, the circuit court must find that "no sufficient cause is shown to the contrary." § 786.36(1). I do not comment on whether Ella's petition, should she file one, be granted or denied. But under the circumstances presented, Ella should not be categorically

17

foreclosed from presenting a name change petition to the circuit court.

¶148 As the district court stated in Krebs, this case presents "important and evolving issues for our society." Krebs, 2020 WL 1479189 at *2 n.3. I agree. Yet the majority ignores such evolution with an incomplete and faulty legal analysis that is contrary to precedent and discounts the burdens Ella faces.

¶149 For the foregoing reasons, I respectfully dissent.

¶150 I am authorized to state that Justices REBECCA FRANK DALLET and JILL J. KAROFSKY join this dissent.